IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| [1] AVIATION TRAINING DEVICES, INC., an Oklahoma Corporation<br><br>Plaintiff,<br><br>v.<br><br>[1] FLIGHTSAFETY SERVICES CORPORATION, a Delaware Corporation<br><br>Defendant. | Case No. 19-cv-00215-CVE-FHM<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, Aviation Training Devices, Inc., an Oklahoma corporation, for its causes of action against Defendant, FlightSafety Services Corporation, a foreign for-profit corporation, states as follows:

1. This diversity action arises out of the breach of a commercial subcontract relating to a federal defense contract.

## PARTIES

2. Plaintiff, Aviation Training Devices, Inc. ("ATD"), is a corporation formed under the laws of the State of Oklahoma, with its headquarters located within this Judicial District. ATD builds equipment used in the flight training industry.

3. Defendant FlightSafety Services Corporation ("FSSC") is a corporation organized under the laws of the State of Delaware, with its principal place of business in Centennial, Colorado. FSSC provides professional aviation instruction and flight simulation systems to end users, including the federal government.

## JURISDICTION AND VENUE

4. Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(1), as the parties are citizens of different States and the amount in controversy exceeds $75,000.00.

5. The substantial portion of the events that gave rise to this suit occurred within this Judicial District. Accordingly, venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b).

## FACTUAL BACKGROUND

### USAF Air Tanker Program

6. The genesis of this lawsuit arises out the United States Air Force's ("USAF") air tanker program. An air tanker is a military transport aircraft which is used to deliver fuel to another military aircraft in mid-air.

7. In 2006, USAF began seeking procurement of new air tankers to replace its existing fleet of air tankers. This new air tanker program was deemed the KC-X.

8. In late January 2007, USAF issued the KC-X Aerial Refueling Aircraft Request For Proposal ("RFP"), which called for production of 179 new air tankers.

9. In or about February 2011, USAF selected Boeing's KC-46 Pegasus as the winner of the bidding. USAF awarded Boeing a development contract, which required Boeing to deliver 18 KC-46 tankers by 2017 with the balance of the 179 new tankers by 2028.

### ATS Program

10. In connection with the new air tanker program, USAF sought bids for the KC-46 Aircraft Training Systems ("ATS"). The ATS program consists of flight simulators to train the air tanker pilots and boom operators to conduct successful air-to-air refueling missions with the new KC-46 aircraft. A "boom operator" is an aircrew member aboard the tanker aircraft who is

responsible for operating the boom, which is a long extendable metal arm attached to the rear underside of the tanker that the boom operator connects to the fuel receptacle of the receiving aircraft. The ATS program called for delivery of thirteen (13) fuselage trainers ("FuT") and twenty-six (26) boom operator trainers ("BOT").

### Flight Safety International

11. FlightSafety International ("FSI"), a New York corporation, is engaged primarily in providing pilot training to aircraft operators, including commercial air carriers and the military. Defendant FSSC operates as a subsidiary of FSI. FSI and FSSC are owned by Berkshire Hathaway. FSSC and FSI are immensely sophisticated enterprises. FSI is not named as a defendant herein. FSI operates a division named FlightSafety Simulation Systems in Broken Arrow, Oklahoma. For purposes of this Complaint, references to FSI refer to the Simulation Systems division of FSI located in Broken Arrow.

### Requests for Quotes

12. In 2012, Defendant FSSC sought quotes from subcontractors, including ATD, for a bid to be submitted to USAF for the KC-46 ATS program.

13. On June 16, 2012, FSSC mailed a Request For Quote ("RFQ") to ATD for the boom operator trainers for the KC-46 ATS program.

14. On June 30, 2012, ATD submitted its proposal to FSSC for the development of the boom operator trainers for the ATS program. FSSC selected ATD's quote to be included in its bid to the USAF for the ATS program.

15. On July 9, 2012, FSSC mailed a Request For Quote ("RFQ") to ATD for the fuselage trainers for the KC-46 ATS program.

16. On July 27, 2012, ATD submitted its proposal to FSSC for the development of the fuselage trainers for the ATS program. FSSC selected ATD's quote to be included in its bid to the USAF for the ATS program.

17. Relying upon the quotes from ATD, FSSC submitted its bid to USAF for the engineering, manufacturing and development work of the KC-46 ATS.

FSSC Awarded KC-46 ATS Contract

18. In May 2013, USAF awarded the ATS contract for the KC-46 to FSSC, and USAF and FSSC entered into U.S. Air Force Prime Contract F33657-01-D-2078-QP02.

19. Based upon representations made by employees and agents of FSI and FSSC, ATD received promises that ATD would be given the subcontract work for the items quoted by ATD for the KC-46 ATS bid, which included 10 fuselage trainers and 10 boom operator trainers.

FSSC and ATD Enter into Subcontract

20. On July 27, 2013, consistent with the representations made by FSI and FSSC, FSSC provided to ATD the Subcontract Statement of Work for the KC-46A fuselage trainers.

21. On July 29, 2013, consistent with the representations made by FSI and FSSC, FSSC provided to ATD the Subcontract Statement of Work for the KC-46A boom operator trainers.

22. On or about September 12, 2013, ATD entered into Fixed Price Subcontract Number KC46-SUB-13-001, KC-46 ("Subcontract") with FSSC. Among other things, the Subcontract incorporated by reference the Statements of Work for the fuselage trainers and the boom operator trainers. This Subcontract provided for FuT #1 and BOTs #1 and #2, with a value of $13,738,627.

23. The Subcontract was not negotiated between the parties, as there was a significant difference in sophistication and bargaining power between the parties. The Subcontract was drafted by FSSC, and it was not subject to change.

24. Although this Subcontract did not include all fuselage trainers and boom operator trainers called for by FSSC's contract with USAF, it was expressly understood by ATD (based upon actions and representations by FSSC and/or FSI) that it would receive all subcontracts for the devices bid upon by ATD.

25. The Subcontract includes a clause for "Termination for Convenience." This clause provides that the "actions between the parties shall be as established in . . . [FAR 52.249-2]." The Federal Acquisition Regulations ("FAR") is a set of regulations regarding government procurement in the United States.

26. A termination for convenience clause provides the federal government the right to terminate all or part of a contract prior to expiration of the contract where such termination is in the government's interest. The federal government's right to termination for convenience protects the public's interest against the government paying for things it may no longer need.

27. FAR 52.249-2, as cited in the Termination for Convenience clause of the Subcontract, is titled "Termination for Convenience of the *Government* (Fixed-Price)." (emphasis added).

28. FAR 52.249-2 specifies the procedures that must be followed in the event the federal government terminates a contract for convenience.

29. FAR 52.249-2 does not grant authority for a private contractor to terminate a contract with a subcontractor absent governmental action on the Prime Contract.

<u>FSSC and ATD Enter into the Subcontract and Modifications</u>

30. After entering into the Subcontract with FSSC, ATD worked diligently in designing and manufacturing the FuT #1 and BOTs #1 and #2.

31. The Statements of Work, prepared by FSSC, provide that FSSC will enter into contractual agreements with other sources to obtain all data required by ATD to complete the work. Pursuant to the Subcontract, FSSC was required to provide the necessary data to FSI's location in Broken Arrow, and FSI, as agent of FSSC, was to provide the data to ATD so that ATD could design, manufacture, and deliver the devices in a timely manner.

32. Notwithstanding its obligation under the Subcontract, FSI, on behalf of FSSC, failed to provide ATD with the technical data ATD needed to meet its contractual deadlines. As early as July 2014, ATD advised FSSC that it had to reverse engineer the specifications as a result of the missing technical data.

33. On or about August 26 through August 27, 2014, a Critical Design Review ("CDR") was held. According to the Statement of Work, the purpose of the CDR was to establish a design baseline configuration for the devices. At the CDR, FSSC announced that there was an aircraft drawing configuration freeze for FuT #1. The Statement of Work required FSSC and FSI to "update the devices based upon all design criteria data available as of the applicable design criteria freeze date."

34. Upon information and belief, at the CDR, FSSC informed USAF that FSSC had all the data that was necessary to complete the project. However, this data was not provided to ATD.

35. Upon information and belief, FSSC received a "milestone payment" from the USAF by stating it possessed all data necessary to complete the project.

36. On or about November 30, 2015, FSSC modified the Subcontract with ATD to include the FuT #2 and BOTs #3 and #4. The Subcontract price was modified to $25,668,096.00.

37. Instead of forming new, independent subcontracts, it was FSSC's custom and practice to modify the Subcontract with ATD to add the new work.

FSSC Impedes ATD's Performance

38. Although it was necessary for ATD to have all data concerning the FuT #1 to perform its obligations under the Subcontract, ATD did not receive interior photographs for the FuT #1 from FSSC until December 10, 2015. The interior photographs provided vital information to allow ATD to manufacture the devices.

39. Despite failing to provide the necessary data to ATD, Derek Mikulski, Senior Contract Specialist for FSSC, sent a Cure Notice to ATD on or about October 25, 2016, claiming a potential default for failure to provide the complete KC-46 Fuselage Trainer drawing package and a recovery plan for FuTs #1 and #2 and BOTs #1, #2, #3 and #4.

40. On November 3, 2016, Roger Ganner of ATD sent a letter to Mr. Mikulski addressing each of the items referenced in the Cure Notice.

41. On December 19, 2016, Mr. Ganner sent an email to Chris White of FSI advising that ATD did not have the CATIA V5 3D datasets that were necessary to manufacture the remaining parts. Mr. White falsely replied that there was not a contract provision for providing these data sets, even though the Subcontract provides that FSSC and FSI are to provide all necessary data to manufacture the devices.

42. On that same day, Mr. Ganner of ATD sent a letter to Ron Ladnier, President of FSSC, regarding the status of the work for the FuT #1, FuT #2, BOT #1, BOT #2, BOT #3 and BOT #4.

### Improper Notice of Partial Termination of FuT #2

43. On December 22, 2016, Mr. Mikulski sent ATD a letter providing for Notice of Partial Termination for Convenience of FuT #2. The letter demanded that ATD provide a "termination settlement proposal" to FSSC.

44. On or about January 4, 2017, Mr. Ganner sent a reply to Mr. Mikulski, assuring him that efforts will be made to meet the deadlines for termination inventory. In the same email, Mr. Ganner informed Mr. Mikulski that the project would likely already have been completed if ATD received the necessary data in a timely manner.

45. On or about January 12, 2017, Mr. Mikulski sent Mr. Ganner an email stating FSSC would accomplish the preliminary inventory exercise the following week and he inaccurately claimed he had communicated with Jim Scott of ATD several times to confirm the preliminary inventory the following week would be supported.

46. Later that same day, Mr. Scott emailed Mr. Mikulski to inform him that he had not been made aware of any preliminary inventory dates. Further, he advised Mr. Mikulski that, even though FuT #1 was at a critical stage, there was no problem with FSSC documenting the inventory as long as there was no interference with the remaining projects.

### Damage to ATD's Relationship with its Subcontractor Because of Acts of FSSC

47. In the same timeframe of the January 12, 2017 communications, Michael Skerrett of FSSC verbally indicated to Mr. Ganner that FSSC wished to inventory the electrical

components for FuT #2 at the facility of Shen Te, which is a subcontractor of ATD for this Subcontract.

48. On or about January 19, 2017, Mr. Ganner informed Mr. Skerrett that ATD would perform Shen Te's inventory, and that Shen Te had been directed to box the materials and bring them to ATD's facility located at 4719 N. Mingo in Tulsa.

49. On or about January 20, 2017, Mr. Skerrett noted in an email to Mr. Scott that he understood but disagreed with moving the electronic equipment.

50. On or about January 20, 2017, FSSC conducted the inventory at Shen Te's facility, despite the prior communications with ATD indicating that it did not approve. ATD did not have knowledge of and did not approve of FSSC's conduct.

51. As a result of FSSC conducting inventory, FSSC damaged the commercial relationship between Shen Te and ATD.

### FSSC's Breach of Promise for BOTs

52. On June 16, 2017, notwithstanding prior assurance from FSSC, Mr. Mikulski sent an email to ATD requesting that ATD re-compete for the remaining BOT devices.

53. The solicitation was required no later than June 30, 2017. This deadline provided ATD only approximately fifteen (15) days to understand and bid an extensive engineering package with value estimated in the tens of millions of dollars for work to be performed over a period of ten (10) years, which required price escalations of all services, overhead, and materials for that performance period.

54. On June 30, 2017, ATD submitted a revised bid to FSSC with a reduced price of $43,087,550.88.

55. On July 6, 2017, after ATD had already submitted its new bid, the Statement of Work to ATD was revised to change the Motion System Components for the remaining BOTs to buyer furnished when those components for the BOTs #1-#4 originally were not buyer furnished. FSSC advised ATD that a competing bidder could not obtain pricing for the Motion System Components in time to meet the bid deadline. Thus, in order to accommodate the competing bidder, FSSC changed the Motion System Components to buyer furnished.

56. On or about July 11, 2017, ATD submitted a new bid which lowered the pricing from $43,087,550.88 to $37,248,485.78 in response to the Statement of Work Rev. 1 that defined the motion system as buyer furnished.

57. On July 14, 2017 Mr. Mikulski advised that ATD was not awarded the contract for the remaining BOT devices. This failure to award this bid was a breach of earlier promises and assurances made by FSSC to ATD concerning this project. FSSC's overt accommodation of the competing bidder was evidence that FSSC had improperly sought to remove ATD from the project. As such, FSSC now directly benefits from the initial expenditures of ATD by contracting with another party for a lower rate, using materials and technology which ATD developed and paid to procure.

FSSC Unlawfully "De-scopes" the Subcontract

58. On or about November 28, 2017, ATD received a letter from Mr. Mikulski, advising ATD that FSSC was "de-scoping" certain line items for the FuT #1, including the cargo floor and power rollers, the door pneumatic systems and test team training. De-scoping involves a change or reduction to the general scope of a contract made pursuant to a changes clause in the contract. This includes changes to drawings, designs or specifications, method of shipment or packing and place of delivery.

59. The Subcontract includes a "Changes" clause which provides that FSSC can unilaterally change the terms of the Subcontract. No consideration is provided for this provision. As such, this provision is illusory.

60. FSSC's intent in de-scoping these items was to unlawfully breach the Subcontract in order to locate a cheaper supplier.

## Unpaid Invoices by FSSC

61. On or about December 5, 2017, ATD shipped the completed FuT #1 to McConnell Air Force base in Kansas.

62. ATD has submitted invoices to FSSC for work on the FuT #1 totaling $2,085,583.00. To date, these invoices have not been paid by FSSC. ATD has fully performed any applicable conditions precedent to payment.

63. On several occasions, FSSC delayed payments to ATD that were lawfully due, resulting in delays of payments to ATD's own subcontractors, delays in the project, and damage to ATD's relationship with its largest subcontractor.

64. On or about April 5, 2018, the USAF contractually accepted the FuT #1 developed by ATD.

65. On April 7, 2018, the FuT #1 manufactured by ATD received its Simulator Certification from USAF.

66. On June 4, 2018, Mikulski sent ATD a letter relating to the Notice of Partial Termination for Convenience and the de-scope proposals for FuT #1 and FuT #2.

67. The June 4, 2018 letter wrongfully contains a deduction of payment lawfully due to ATD for "FlightSafety labor and materials cost" in the amount of $1,884,124.44.

68. The June 4, 2018 letter lists twelve (12) line items as the basis for FSSC's deduction of payment of $1,884,124.44. None of these line items are for work required to be performed by ATD under the terms of the Subcontract. Thus, these items are not properly chargeable to ATD.

69. Further, the June 4, 2018 letter also calls for the reduction of the total Subcontract value by an additional $3,033,168.00 for "FuT #2 PBP milestones 2-5. The reductions of the Subcontract value are not proper.

70. At all times, ATD, in good faith, complied with the terms of the Subcontract, and it is owed the full amount of the outstanding invoices in the amount of $2,085,583.00.

### Status of KC-46 Project

71. The actual delivery of the KC-46 tankers by Boeing to the USAF did not occur until January 2019.

### CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT – UNPAID INVOICES

72. ATD hereby adopts and incorporates the allegations set forth in paragraphs 1 to 71 above, as though fully set forth herein.

73. ATD fully performed work under the terms of the Subcontract, and submitted the following invoices to FSSC for payment:

    a. No. 2385 dated December 1, 2017

    b. No. 2403 dated February 26, 2018

    c. No. 2404 dated February 26, 2018

    d. No. 2412 dated April 17, 2018

    e. No. 2413 dated April 17, 2018 and

    f.  No. 2414 dated April 17, 2018

74. The total amount due for these invoices is $2,085,583.00.

75. To date, these invoices have not been paid by FSSC.

76. FSSC is in breach of the Subcontract for failure to pay, and ATD is entitled to a judgment in the amount of $2,085,583.00.

**COUNT II**
**BREACH OF CONTRACT**

77. ATD hereby adopts and incorporates the allegations set forth in paragraphs 1 to 76 above, as though fully set forth herein.

78. FSSC materially breached the Subcontract for the KC-46 project by partially terminating the Subcontract "for convenience," resulting in serious financial injury to ATD.

79. The provisions within the Subcontract agreement pertaining to "termination for convenience," apply only to the convenience of the governmental agency of the Prime Contract, not that of FSSC.

80. If the "termination for convenience" provision were applicable to this private contract, the Subcontract is illusory because it allows for unilateral termination at any time.

81. Even if the "termination for convenience" provision did apply to this private contract, it is unenforceable for want of consideration.

82. As a direct and proximate result of FSSC's actions, ATD has suffered damages in an amount to be proven at trial.

**COUNT III**
**BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**

83. ATD hereby adopts and incorporates the allegations set forth in paragraphs 1 to 82 above, as though fully set forth herein.

84. Upon information and belief, FSSC partially terminated the agreements with ATD to conduct business with another subcontractor, producing inferior products at a lower rate, while FSSC still collected the full fees from their Government Prime Contract.

85. The agreements between ATD and FSSC contained implied covenants of good faith and fair dealing, pursuant to which FSSC agreed to deal in good faith and fairly with ATD, and to avoid any act that would deprive ATD of the benefits of the agreement and reasonable expectations of ATD and FSSC.

86. Notwithstanding this implied covenant, FSSC breached the covenant by terminating the contract after ATD fronted the initial costs for the express purpose of contracting with another subcontractor at a lower cost.

87. ATD has fully performed all of the terms and conditions required of ATD by the terms of the agreement, except those waived, excused or prevented by FSSC, and FSSC's performance has not been excused.

88. Such actions by FSSC, among other wrongful conduct, breached the implied covenant of good faith and fair dealing.

89. As a direct and proximate result of FSSC's breach of the implied covenant of good faith and fair dealing, ATD has suffered damages in an amount to be proven at trial.

## COUNT IV
## UNJUST ENRICHMENT

90. ATD hereby adopts and incorporates the allegations set forth in paragraphs 1 to 89 above, as though fully set forth herein.

91. FSSC, by terminating the contract with ATD, has been unjustly enriched as FSSC used pricing from ATD's fixed-price bid for their own bid to the Government.

92. Many of the required parts and pieces were not yet in existence and were required to be designed prior to ATD placing their risky, fixed-price bid to FSSC.

93. FSSC materially benefitted from ATD's upfront expenditures by securing a higher priced Government contract at ATD's risk.

94. Upon information and belief, FSSC wrongfully terminated the Subcontract with ATD to seek a lower priced subcontractor after ATD expended significant costs and resources upfront in exchange for future profits pursuant to their bid.

95. As a direct and proximate result of FSSC's actions, ATD has suffered damages in an amount to be proven at trial.

## COUNT V
## PROMISSORY ESTOPPEL

96. ATD hereby adopts and incorporates the allegations set forth in paragraphs 1 to 95 above.

97. ATD and FSSC engaged in numerous email conversations, written agreements, and oral conversations pertaining to the completion of the subcontracts.

98. FSSC's communications to and written agreements with ATD induced actions by ATD to ensure sufficient manpower, real estate, and other resources were available to complete the bids submitted to FSSC in a timely manner.

99. Due to the time constraints of the subcontract, ATD was forced to procure labor at above-normal costs.

100. ATD fronted the expenses of developing materials, parts, and software necessary to complete the project. Such materials did not exist at the time of contracting, and ATD developed, or contracted other parties to develop the necessary parts for the FuTs and BOTs to be created.

101. ATD relied on assurances from FSSC and/or FSI that ATD would receive future contracts to offset its initial expenses of developing the parts and materials for the projects.

102. FSSC now directly benefits from the initial expenditures of ATD by contracting with another party for a lower rate, using materials and technology which ATD developed and paid to procure.

103. ATD lost the opportunity to work on other projects as result of the actions of FSSC.

104. ATD reasonably and detrimentally relied upon the promises of FSSC in securing resources and placing efforts towards the accepted bids.

105. Not enforcing the promises made and the reasonable expectations of the parties would not be in the interest of justice and would financially harm ATD as a result of its good faith reliance on the promises made by FSSC.

106. As a direct and proximate result of FSSC's actions, ATD has suffered damages in an amount to be proven at trial.

## JURY DEMAND

Plaintiff, ATD, hereby demands a trial by jury on all issues.

**WHEREFORE**, Plaintiff, Aviation Training Devices, Inc., prays that this Court enter judgment against Defendant, FlightSafety Services Corporation, for damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), and for such further relief as this Court deems proper.

Respectfully Submitted,

  /s/ Donald A. Lepp
Donald A. Lepp, OBA No. 16260
Logan James, OBA No. 32430
DRUMMOND LAW, PLLC
1500 South Utica, Suite 400
Tulsa, Oklahoma  74103
(918) 749-7378 – *telephone*
(918) 749-7869 – *facsimile*

**Attorneys for Plaintiff**